**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TELEPHONE SCIENCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 15-CV-5182 |
| | ) | |
| ASSET RECOVERY SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Plaintiff Telephone Science Corporation ("TSC") filed its Second Amended Complaint on February 9, 2016, alleging that Defendant Asset Recovery Solutions, LLC ("ARS") willfully and knowingly violated the Telephone Consumer Protection Act, 42 U.S.C. § 227, *et seq.* ("TCPA"). (*See generally* R.77). Before the Court are several motions relating to the Second Amended Complaint: (1) ARS' Rule 12(b)(1) motion to dismiss for lack of Article III standing (R.81); (2) ARS' Rule 12(b)(6) motion to dismiss for failure to state a claim (R.84); and (3) ARS' Rule 15 motion to strike 297 claims added without leave of the Court (R.87).

For the following reasons, the Court denies ARS' Rule 12(b)(1) motion (R.81) and denies as moot ARS' motion to strike. (R.87). The Court grants ARS' Rule 12(b)(6) motion and dismisses this case with prejudice. (R.84).

## BACKGROUND

## I.     Robocalls & TSC's "Nomorobo" Service

TSC operates a service called "Nomorobo," designed to help consumers avoid incoming computerized telephone calls that the Federal Trade Commission ("FTC") refers to as

"robocalls"—calls made with either an automatic telephone dialing system ("ATDS") or with a prerecorded or artificial voice. (R.77, ¶¶ 5-6). In 2013, the FTC declared Nomorobo a winner of its contest to "design a system to stop unsolicited telemarketing calls before the calls can ring through to the subscriber of the called telephone number." (*Id.* ¶ 7). To date, Nomorobo has helped consumers "avoid over 64 million unwanted robocalls." (*Id.* ¶ 9). Specifically, TSC maintains a "honeypot" of telephone numbers to which TSC subscribes. (*Id.* ¶¶ 10-12). Nomorobo analyzes calls placed to TSC's honeypot numbers using a specialized algorithm, enabling it to "detect high frequency robocalling patterns and distinguish between calls placed by robocallers and calls placed by non-robocallers." (*Id.* ¶¶ 13, 8). Consumers and businesses subscribe to Nomorobo's call-blocking services for a fee. (R.115, TSC Response to ARS' Mot. to Take Judicial Notice; *see also* R.113, R.116).[1] These users choose to route their incoming calls to both their personal phones and the Nomorobo server, using simultaneous ring technology. "If Nomorobo determines that it is a robocaller, Nomorobo answers the call on behalf of the user." (R.82-3, TSC Ltr. to FCC). The robocaller, however, is "presented with an audio CAPTCHA [Completely Automated Public Turing Test to tell Computers and Humans Apart]. If the caller passes the test and proves they are human, the call is allowed through. If they fail, Nomorobo hangs up the call." (R.82-4, Twilio Customer Stories at 2). Nomorobo either blocks or allows the call within 200 milliseconds of its receipt. (*Id.*).

ARS is an asset recovery management and debt purchasing company that uses a "predictive dialer" in connection with its business. (R.77, Second Am. Compl. ¶¶ 15-17). A "predictive dialer" is "equipment that dials numbers and, when certain computer software is

---

[1] In considering the parties' arguments related to ARS' motion to dismiss based on factual issues surrounding standing, the Court is permitted to "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009).

attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." (*Id.* ¶ 18). A predictive dialer is an ATDS within the meaning of the TCPA. (*Id.* ¶ 48).

## II. The Alleged TCPA Violations & Incurred Expenses

TSC alleges that, around March 2014, ARS began calling telephone numbers in the TSC honeypot ("TSC Numbers") using a predictive dialer. (*Id.* ¶¶ 19-23). TSC "was the subscriber to each TSC Number [that ARS] called at the time of the call," and TSC "continues to subscribe to each TSC Number." (*Id.* ¶¶ 24-25). TSC never consented to these calls. (*Id.* ¶¶ 26-27). TSC does not solicit or otherwise entice incoming calls to TSC Numbers. (*Id.* ¶¶ 33-34). Each TSC Number is assigned to a voice over Internet protocol ("VoIP") telephone service. (*Id.* ¶ 28). The VoIP service provider, Twilio, Inc. ("Twilio"), assesses (i) a monthly per-line charge for each TSC Number, as well as (ii) a per-minute charge for each inbound call that TSC answers. (*Id.* ¶¶ 28-30; *see also* R.108, Am. Foss Decl. ¶¶ 3, 5-6).

TSC alleges that, between March 2014 and February 2016, ARS placed approximately 12,240 robocalls to TSC Numbers from ten telephone numbers using a predictive dialer. (*Id.* ¶ 37). TSC has answered approximately 747 of these robocalls. (*Id.* ¶¶ 39-40; R.77-1, Exhibit A, "ARS's Answered Calls to TSC Numbers"). TSC only began answering these calls—among other robocalls—on May 13, 2015. (R.108, Am. Foss Decl. ¶ 13). According to TSC's founder, Aaron Foss ("Foss"), "for each answered robocall, including but not limited to the robocalls placed by ARS to TSC telephone numbers, Twilio charged TSC a per-minute charge in the amount of $0.0075." (*Id.* ¶ 14). Accordingly, the "total per-minute charges that TSC incurred as

a result of the robocalls that ARS placed to TSC, which TSC answered, during the months May 2015 through January 2016 is $5.60." (*Id.* ¶ 20).[2]

TSC now seeks relief under the TCPA "based on past and future ARS robocalls to TSC Numbers, which TSC answered (or will answer) and for which TSC has incurred (or will incur) per-minute charges." (R.77, Second Am. Compl. ¶¶ 41-42, 52). Specifically, TSC alleges that ARS "willfully and knowingly violated 47 U.S.C. § 227(b)(1)(A) on multiple and separate occasions by using an ATDS to call TSC at a telephone number assigned to a service for which TSC is charged for the call without TSC's prior express consent." (*Id.* ¶ 70). TSC prays for (i) injunctive relief to prevent ARS from placing further telephone calls to TSC Numbers, and (ii) a judgment for statutory damages pursuant to 47 U.S.C. § 227(b)(3) for "each and every call ARS made in violation of the TCPA." (*Id.* ¶ 72).

### III.    Procedural History

In August 2015, ARS moved to dismiss TSC's original complaint pursuant to Rule 12(b)(6) and to stay the proceedings pending the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 742 F.3d 409 (9th Cir. 2014), *cert. granted*, 135 S.Ct. 1892 (U.S. Apr. 27, 2015) (No. 13-1339). (R.17, R.24). During the hearing on those motions, counsel for ARS requested "limited jurisdictional discovery" with respect to a potential Rule 12(b)(1) challenge. (R.43-1, August 2015 Hearing Tr. at 3). Specifically, counsel for ARS represented that their "research" had revealed that: (i) calling some TSC Numbers identified in the original complaint resulted in a busy signal, raising a question "as to whether the calls are even answered;" and (ii) about "90 percent of the [TSC] phone numbers trace back to consumers" rather than to TSC. (*Id.*). Counsel for ARS thus requested "some records" to establish that the phone numbers "do, in fact, trace back." (*Id.* at 4). Counsel for ARS also requested the opportunity to "further explore" the

---

[2]  This computes out to each answered call lasting, on average, one minute or less (747 x 0.0075 = 5.60).

"payment issue" with respect "to the VoIP and the charges," noting that a Fourth Circuit case to which TSC had cited in the First Amended Complaint had no "precedential value[.]"[3]  (*Id.*).  The Court permitted "limited discovery" on jurisdictional issues.  (R.28).  Subsequently, TSC produced to ARS:  (i) the VoIP Service Agreement between TSC and Twilio; (ii) an addendum to the VoIP Service Agreement; (iii) an August 17, 2015 letter from Twilio, which "confirms that TSC is the subscriber to each telephone number identified" in the complaint; and (iv) Twilio invoices "reflecting all per-minute charges TSC incurred in May, June, July, and August of 2015," as well as receipts "for TSC's payments of the aforementioned invoices."  (R.43-2, Menditto Decl. to Mot. to Compel ¶¶ 2-6).

In September 2015, ARS moved to compel TSC to respond to certain interrogatories and document requests.  (R.39).  After hearing the parties' arguments[4] and reviewing their briefs, the Court denied ARS' motion.  The Court, in particular, denied Interrogatory No. 10 and Document Request No. 13[5] as premature, noting that "some of these requests will be very appropriate when we get to the substantive part of the case, but are not appropriate for the limited jurisdictional

---

[3]  *See* R.26, First Am. Compl. at ¶ 43 ("The VoIP telephone service to which the TSC numbers are assigned is a "service for which the called party is charged for the call" within the meaning of the TCPA.  *See Lynn v. Monarch Recovery Mgmt., Inc.*, 586 Fed. App'x. 103 (4th Cir. 2014); *affirming Lynn v. Monarch Recovery Mgmt., Inc.*, Dkt. 1:11-cv-02824-WDQ (D. Md. Mar. 25, 2013) (VoIP service for which plaintiff was charged $0.0149 per minute for each of defendant's incoming calls "fits squarely within the separate prohibition of the [TCPA's] call charged provision")).

[4]  During the hearing, for example, counsel for ARS argued that, "while [at the August 2015 hearing] we provided the Court with an idea of the type of the discovery that we sought, we in no way meant to imply that those were going to be the only two things sought by way of jurisdictional discovery."  (R.51-1, Sept. 2015 Hearing Tr. at 5).  Counsel for TSC characterized this argument as "disingenuous," and argued that, "when we get into discovery, we will produce [Foss] for his deposition.  We will provide hundreds of pages of call detail records when we get to that.  But currently we're not allowed to conduct discovery."  (*Id.* at 8, 11).

[5]  Interrogatory No. 10, for example, asked TSC to provide certain information for each of the 450 answered calls at issue in the First Amended Complaint – specifically, (i) which TSC Number was called; (ii) the date, time, and duration of the call; (iii) whether the call was answered by a person and, if so, who; (iv) whether the call was answered by an "app" and/or "program" and, if so, which instructions were used for the "app" or "program"; (v) whether TSC had informed ARS that the TSC Number belonged to TSC, and not a consumer; (vi) whether TSC recorded the call; and (vii) a description of any communication on the call.  Document Request No. 13, meanwhile, requested all documents "showing the date(s) on which TSC answered each of the 450 calls."  (*See generally* R.39-4, TSC Combined Responses to ARS' Discovery Requests; *see also* R.32-2, Foss Decl. at ¶¶ 10-11 (clarifying 450 answered calls at issue in the First Amended Complaint)).

discovery that the Court granted in this case." (R.51-1, Sept. 2015 Hearing Tr. at 11-13). ARS then moved to dismiss the First Amended Complaint under Rule 12(b)(1) and Rule 12(b)(6). (R.45, R.47).

Meanwhile, the Court granted ARS' motion to stay the proceedings pending the Supreme Court's decision in *Spokeo* (R.71), reasoning, in part, that TSC's complaint allegations were "not limited to those calls that generated the alleged monetary damage." Rather, TSC sought relief for all calls that ARS *placed* to TSC, including calls that TSC did not answer and for which TSC did not incur a charge. (*Id.* at 5-9). In light of the stay, the Court dismissed ARS' pending Rule 12 motions as premature. (R.70). Thereafter, TSC moved the Court "to enter an order lifting the stay in this case, granting TSC leave to drop with prejudice its claims based on unanswered calls[.]" (R.72). The Court granted TSC's motion, ordering TSC to file an amended complaint. (R.75; *see also* R.93-1, Jan. 2016 Hearing Tr. at 4).[6] On February 9, 2016, TSC filed the Second Amended Complaint. (R.77).

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). Under federal pleading standards, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007)). In reviewing a complaint, the Court must accept all "factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor." *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). "[L]egal

---

[6] The Court further directed the parties to meet and confer regarding whether TSC needed to list out each of the "answered 690 calls" in the amended pleading. (*Id.* at 5).

conclusions and conclusory allegations merely reciting the elements of the claim," however, "are not entitled to this presumption" of truth. *Id.*

Additionally, in ruling on a Rule 12(b)(1) motion to dismiss for lack of standing, "the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor." *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) (citing *Ret. Chicago Police Assoc. v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996)). District courts may, however, "properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008) (citation and quotation omitted). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the required elements of standing[,]" including (i) injury in fact; (ii) causation; and (iii) redressability. *Lee*, 330 F.3d at 468 (citation and quotation omitted). "If standing is challenged as a factual matter, the plaintiff must come forward with 'competent proof'—that is a showing by a preponderance of the evidence—that standing exists." *Id.* An "erroneous legal conclusion," however, does not constitute a "factual challenge." *Id.* at 469.

## ANALYSIS

### I.    Rule 12(b)(1) Motion

Under Rule 12(b)(1), a court must dismiss a claim if it lacks subject-matter jurisdiction over it. *See State of Illinois v. City of Chicago*, 137 F.3d 474, 478 (7th Cir. 1998) ("Subject-matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction it must proceed no further"). As the Supreme Court has instructed, the elements of Article III standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, [and] each element must be supported in the same way as any other matter on

which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

### A.    Factual Versus Facial Challenge

ARS' chief argument is that "TSC, faced with a factual challenge to jurisdiction, was required to prove by a preponderance of the evidence that this Court has jurisdiction to hear the case.  TSC failed to do so, and its case should be dismissed."  (R.103, 12(b)(1) Reply Br. at 1-2). According to ARS, its factual challenge required TSC to "prove a charge was incurred by it with respect to each and every claim asserted by it" – that is, to produce evidence conclusively tying Twilio's per-minute charges to "any of the 185 telephone numbers or 747 calls at issue in [the] Second Amended Complaint[.]"  (*Id.*).  The Court disagrees with ARS' characterization of TSC's burden at this stage of the litigation.

The Second Amended Complaint alleges that (i) TSC answered approximately 747 ARS robocalls, and (ii) TSC incurred a per-minute charge for each ARS robocall.  (R.77, ¶¶ 39-41; R.77-1, Exhibit A, "ARS's Answered Calls to TSC Numbers").  ARS argues that no presumptive truthfulness attaches to these allegations because it has made a "factual challenge" to standing. ARS ignores, however, that *it*—not TSC—bears the initial burden of proffering "evidence" to call TSC's standing into question.  *See Apex*, 572 F.3d at 444 ("Sears produced evidence calling Apex's standing into question—a letter indicating that Apex had sold and assigned *all rights* in its accounts receivable to CIT.  Once such evidence is proffered, the presumption of correctness that we accord to a complaint's allegations falls away . . .") (citation and quotation omitted); *see also Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998) ("The presumption of correctness that we accord to a complaint's allegations falls

away on the jurisdictional issue once a defendant proffers evidence that calls the court's jurisdiction into question"); *Kanzelberger v. Kanzelberger*, 782 F.2d 774, 777 (7th Cir. 1986) (only when "facts place the district court on notice that the jurisdictional allegation probably is false" is the court "duty-bound to demand proof of its truth").

Here, ARS has failed to identify "external facts" calling into question whether TSC incurred an out-of-pocket expense for each answered ARS robocall. *See Apex*, 572 F.3d at 444. During the August 2015 hearing, counsel for ARS represented that their "research" raised some question as to whether the TSC Numbers, in fact, traced back to TSC. (R.43-1, Aug. 2015 Hearing Tr. at 4). The Court granted limited jurisdictional discovery against this factual challenge. (R.28). ARS' present standing challenge, however, does not concern whether TSC was the "subscriber" to each TSC Number. Rather, ARS challenges the truthfulness of TSC's "incurred expense" allegation. (R.84, 12(b)(1) Opening Br. at 2, 8-10; R.103, 12(b)(1) Reply Br. at 3-6). While ARS may have had some questions regarding the "payment issue," (R.43-1, Aug. 2015 Hearing Tr. at 4), ARS did not then—and does not now—set forth "evidence calling [TSC's] standing into question" with respect to its alleged injury. *See Apex*, 572 F.3d at 444; *Garecht v. Prof'l Transp., Inc.*, No. 14-CV-0378-SMY-DGW, 2015 WL 3862723, at *2 (S.D. Ill. June 22, 2015) ("At this juncture, the Court is not persuaded that Plaintiff's alleged standing is false"). ARS proffers no evidence, for example, that it was "unable to locate any account tied to the [telephone number at issue], because it had never placed a call to such number" or that "no such number existed in its [debt collection] system." *See Wallace v. Enhanced Recovery Co., LLC*, No. 7:13-CV-124-FL, 2015 WL 5455937, at *3, 5 (E.D.N.C. Sept. 16, 2015), *aff'd sub nom*, No. 15-2194, 2016 WL 3402539 (4th Cir. June 21, 2016) (citing affidavit evidence).[7] Absent a "true factual dispute," the Court need not "demand proof of jurisdiction." *Apex*, 572

---

[7] ARS relies upon *Wallace* in support of its "factual challenge" arguments.

F.3d at 446; *see also Leung v. XPO Logistics, Inc.*, No. 15 C 03877, 2015 WL 10433667, at *3 (N.D. Ill. Dec. 9, 2015) ("Although the burden to prove jurisdiction ultimately rests with Leung, he only needs to come forward with evidence (at least at this early stage of the case) if XPO first produces something suggesting that Leung lacks standing"); *Kanzelberger*, 782 F.2d at 777 ("We do not suggest that the district court . . . must always or even often conduct an inquest on jurisdiction; but certainly if deficiencies in the pleadings, or facts brought out in pretrial discovery or at trial, fairly shriek that there is no federal jurisdiction, the district judge must conduct whatever supplementary factual proceedings are necessary to resolve the doubt").

The Court, thus, accepts the Second Amended Complaint's "injury-in-fact" allegations as true. *See Apex*, 572 F.3d at 444-46. These allegations "plausibly suggest" that TSC incurred— and paid for—per-minute charges based on ARS robocalls, supporting injury-in-fact sufficient for Article III standing. *See Silha v. ACT, Inc*., 807 F.3d 169, 173-74 (7th Cir. 2015) (clarifying "the standard for facial challenges to subject matter jurisdiction under Rule 12(b)(1)"); *Doe v. Chao*, 540 U.S. 614, 627 n.12 (2004) (out-of-pocket expenses "suffice to qualify under any view of actual damages"). Even if the law required more of TSC in this case, it has satisfied its "burden of proof" at this stage of the litigation. *See Lujan*, 504 U.S. at 561. Taken together, (i) the Second Amended Complaint, (ii) the Foss Declaration, (iii) the VoIP Service Agreement, (iv) the Twilio invoices, and (v) TSC's invoice payment receipts, all support the existence of an injury.

The Court recognizes that the Twilio invoices do not actually link any charge to any inbound telephone number. (R.108, Am. Foss Decl. ¶ 16 (noting that the Twilio invoices neither "break out each individual telephone number for which TSC incurs a per-line or a per-minute charge" nor "break out each per-minute charge on a per-call basis")). Such detailed call records

or equivalent evidence, however, are not required at this stage of the litigation.  (R.51-1, Sept. 2015 Hearing Tr. at 11-12 ("some of these requests will be very appropriate when we get to the substantive part of the case, but are not appropriate for the limited jurisdictional discovery that the Court granted in this case")).  The Foss Declaration and other jurisdictional record evidence, moreover, support TSC's "injury-in-fact" allegations.  (R.108, Am. Foss Decl. ¶¶ 18-19 (averring that the "total number of answered minutes" and "total per-minute charges" for TSC for the months May 2015 through January 2016 includes ARS robocalls); R.77-1, Exhibit A to the Second Am. Compl., "ARS's Answered Calls to TSC Numbers" (outlining the date, originating ARS telephone number, and TSC terminating number of each telephone call placed by ARS, which TSC answered, from May 13, 2015 through February 4, 2016)).  As TSC has explained, its "software identifies (a) the ARS telephone number from which the robocall originated, (b) the TSC telephone number that ARS called, and (c) the date and time of the robocall[.]"  (R.115, TSC Response to ARS' Mot. to Take Judicial Notice at 2).  In light of this evidence, TSC has met its burden of "establishing the required elements of standing."  *See Lee*, 330 F.3d at 468.

## B.    Bare Statutory Violation Analysis

ARS next argues that the TCPA provision on which TSC relies—the "call-charged" provision—requires a showing of "actual damages" in order to establish "even a bare bones statutory violation."  (R.82, 12(b)(1) Opening Br. at 14) (citing 47 U.S.C. § 227(b)(1)(A)(iii) (prohibiting the use of any ATDS or artificial or prerecorded voice to make any call to "any telephone number assigned to . . . any service for which the called party is charged for the call")).  According to ARS, because TSC has failed to *prove* that it incurred any charge based on any ARS robocall, it has "failed to establish standing even based on a bare statutory violation."  (*Id.*

11

at 16).  This argument fails for the same reasons set forth above with respect to ARS' related "burden of proof" challenge.

### C. Self-Infliction Analysis

Lastly, ARS argues that TSC's alleged injury is "self-inflicted" and, therefore, insufficient to establish constitutional standing.  The Second Amended Complaint alleges that ARS initiated the phone calls at issue.  (R.77 at ¶¶ 22, 33-38).  Because ARS initiated these calls, the Court cannot say that TSC's role in answering the calls severed the causal connection between conduct and injury, depriving TSC of Article III standing.  *See Procaps S.A. v. Patheon, Inc.*, No. 12-24356-CIV, 2014 WL 320303, at *6-7 (S.D. Fla. Jan. 29, 2014) ("Patheon ignores the fact that it threw the unlawful antitrust punch that started the causal chain in Procaps' antitrust injury").

To establish Article III standing, a plaintiff must show that he sustained an injury that is "fairly traceable to the challenged action of the defendant."  *Silha*, 807 F.3d at 173.  An injury is not "fairly traceable" where it "is so completely due to [a complainant's] own fault as to break the causal chain" between the injury and the defendant's conduct.  *See Petro-Chem Processing, Inc. v. E.P.A.*, 866 F.2d 433, 438 (D.C. Cir. 1989) (Ginsburg, J.); *see also* 13A Charles A. Wright, Arthur R. Miller &  Edward H. Cooper, Federal Practice & Procedure § 3531.5 (3d ed. 2008) ("Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain").  Litigants "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1151 (2013).

ARS—attempting to distinguish *Procaps*—argues that TSC (i) knowingly sought out the assignment of the "dirtiest, nastiest" robocalled numbers, and (ii) intentionally altered its

business practice by answering these calls, "solely to manufacture an injury" in this case. (R.84, 12(b)(1) Opening Br. at 11-14). ARS likens this case, instead, to *Big Blue Capital Partners, LLC v. Recontrust Company*, No. 6:11-CV-06368-AA, 2012 WL 1605784 (D. Or. May 4, 2012). In *Big Blue Capital Partners*, however, the plaintiff lacked standing because the injury it sustained in purchasing an encumbered property—after non-judicial foreclosure proceedings had commenced—was not traceable to the defendant. *Id.* at *5. Rather, the plaintiff created its own injury by deciding to purchase a property in foreclosure. *Id.* Conversely, here, TSC's decision to subscribe to troubled phone numbers—while likely increasing the probability of an injury— did not itself cause the injury in question. No injury would have occurred absent the phone calls initiated by ARS. *See ACLU v. City of St. Charles*, 794 F.2d 265, 268 (7th Cir. 1986) (Posner, J.) (finding a constitutional injury notwithstanding the argument that "the plaintiffs have inflicted this cost on themselves and can avoid it by continuing to follow their accustomed routes and shrugging off the presence" of the religious display at issue). For this reason, the Court cannot say that TSC's practice of answering robocalls since May 2015 constitutes "an unreasonable decision . . . to bring about a harm that [it] knew to be avoidable." *St. Pierre v. Dyer*, 208 F.3d 394, 403 (2d Cir. 2000). Because TSC's alleged injuries "were not entirely self-caused," *Procaps*, 2014 WL 320303 at *8, but rather are "fairly traceable" to ARS' alleged conduct, the Court declines to dismiss the Second Amended Complaint for lack of Article III standing. *See Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 517-18 (7th Cir. 2010) (no Article III standing with respect to an "entirely self-inflicted" injury resulting "solely" from plaintiff's own conduct).

**II.     Rule 12(b)(6) Motion**

The Court next addresses ARS' Rule 12(b)(6) challenge.  ARS seeks to dismiss this case for the following reasons:  (1) TSC is outside the TCPA's "zone of interests;" (2) TSC has waived the right not to receive robocalls by intentionally seeking out such calls; (3) TSC has failed to plead that ARS placed the alleged calls using an automated dialer without human intervention; (4) TSC has failed to plead that its VoIP service is wireless, thus falling outside Section 227(b)(1)(A)(iii)'s purview; and (5) TSC has failed to plead that ARS "willfully or knowingly" violated the TCPA, thus barring its demand for treble damages.  (R.84).

**A.     "Zone of Interests" Analysis**

TSC brings suit under 47 U.S.C. § 227(b)(1)(A)(iii), which provides:

> **(b) Restrictions on use of automated telephone equipment**
>
> **(1) Prohibitions**
>
> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—
>
> **(A)** to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—
>
> **(iii)** to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service  for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

47 U.S.C. § 227(b)(1)(A)(iii).

According to TSC, "ARS violated 47 U.S.C. § 227(b)(1)(A) on multiple and separate occasions by using an ATDS to call TSC at a telephone number assigned to a service for which TSC is charged for the call without TSC's prior express consent."  (R.77, Second Am. Compl. ¶ 61).  TSC contends, moreover, that it qualifies as a "person or entity" upon which Section 227(b)(3) confers a private right of action to enforce the TCPA.  Section 227(b)(3) provides:

**(3) Private right of action**

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

> **(A)** an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
> **(B)** an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or
> **(C)** both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(3).  *See also Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 491-92 (7th Cir. 2014) (recognizing that the availability of statutory damages under the TCPA increases "the incentives for private enforcement of [the] law").

ARS argues that TSC falls outside the statute's "zone-of-interests."  The purpose of Section 227(b)(1)(A)(iii), ARS argues, is "[t]o protect those who do not want to receive certain types of calls on certain types of phone services from receiving those calls on those phone services." (R.85, Rule 12(b)(6) Opening Br. at 7).  According to ARS, the TCPA guards against the "invasion of privacy, the nuisance, and the cost that results when consumers receive certain types of *unwanted* calls;" it does not protect a company that "intentionally sought out the alleged calls so that it could build and sustain its for-profit telecom business."  (*Id.* at 7-10) (emphasis in original).

### 1.    The "Zone-of-Interests" Test Applies

The zone-of-interests test "applies to all statutorily created causes of action."  *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1388 (2014).  As the Seventh Circuit has instructed, the inquiry is "whether [a] claim comes within the zone of interests regulated by a specific statute."  *Pennsylvania Chiropractic Ass'n v. Indep. Hosp. Indem. Plan,*

*Inc.*, 802 F.3d 926, 928 (7th Cir. 2015); *United States v. All Funds on Deposit,* 783 F.3d 607, 617 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1374 (2016) ("Even though Appellees possess constitutional standing, we may nevertheless decline to hear this case if Appellees do not fall within the zone of interests protected by the law invoked. This is a question of statutory standing") (citation and quotation omitted).

"Congress is presumed to legislate against the background of the zone-of-interests limitation, which applies unless it is expressly negated." *Lexmark*, 134 S. Ct. at 1388 (citation and quotation omitted); *see also Todd v. Collecto, Inc.*, 731 F.3d 734, 736 (7th Cir. 2013) ("Absent different indications from statutory text, only a person within a statutory provision's 'zone of interest' has standing to sue under it"). *In Bennett v. Spear*, for example, the Supreme Court addressed, in part, whether the citizen-suit provision of the Endangered Species Act ("ESA") "negates the zone-of-interests test (or, perhaps more accurately, expands the zone of interests). We think it does." 520 U.S. 154, 164 (1997). To confirm its "readiness to take the term 'any person' at face value" and, thereby, to endorse a theory of "expanded standing," the *Bennett* Court looked to (i) the "remarkable breadth" of the ESA's citizen-suit provision (16 U.S.C. § 1540(g)), as well as (ii) the "overall subject matter of this legislation . . . the environment (a matter in which it is common to think all persons have an interest)." *Id*. at 164-65.

As a threshold matter, thus, the Court must address whether the TCPA "protect[s] a more-than-usually 'expan[sive]' range of interests" – in other words, whether Congress has negated the zone-of-interest limitation. *Lexmark*, 134 S. Ct. at 1388 (citing *Bennett*, 520 U.S. at 164). Here, TSC likens Section 227(b)(3) of the TCPA to Section 1540(g) of the ESA, arguing that—under the "person or entity" language—statutory standing is "expanded to the fullest

extent permitted by Article III." (R.95, 12(b)(6) Response Br. at 15) (citing *Bennett*, 520 U.S. at 166)). The Court disagrees.

Section 1540(g) of the ESA (entitled "Citizen suits") provides, in part:

**(g) Citizen suits**

**(1)** Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—

> **(A)** to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; []

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation[]

**(2)**
> **(A)** No action may be commenced under subparagraph (1)(A) of this section—
> > **(i)** prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;
> > **(ii)** if the Secretary has commenced action to impose a penalty pursuant to subsection (a) of this section; or
> > **(iii)** if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation.

**(3)**
> **(A)** Any suit under this subsection may be brought in the judicial district in which the violation occurs.
> **(B)** In any such suit under this subsection in which the United States is not a party, the Attorney General, at the request of the Secretary, may intervene on behalf of the United States as a matter of right.

**(4)** The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

16 U.S.C. § 1540(g). This provision thus evinces an "intent to permit enforcement by everyman" through its "elimination of the usual amount-in-controversy and diversity-of-citizenship requirements, its provision for recovery of the costs of litigation (including even

expert witness fees), and its reservation to the Government of a right of first refusal to pursue the action initially and a right to intervene later." *Bennett*, 520 U.S. at 165-66. Such breadth is not present, by contrast, in Section 227(b)(3) of the TCPA, entitled "Private right of action." *See J2 Glob. Commc'ns, Inc. v. Protus IP Sols.*, No. CV 06-00566 DDP AJWX, 2010 WL 9446806, at *4 (C.D. Cal. Oct. 1, 2010) (observing that § 227(b)(3) is "significantly narrower than the citizen-suit provision" of the ESA). Indeed, *Bennett* explicitly distinguished Section 1540(g) from "statutes concerning unfair trade practices and other commercial matters," wherein Congress used more restrictive "any person" language. *See Bennett*, 520 U.S. at 165. Moreover, unlike the ESA, the TCPA does not concern a "matter in which it is common to think all persons have an interest." *Id.* The TCPA confers a private right of action on the basis of individualized violations; it does not confer a right upon "any person" to commence an action in the name of consumer protection. *See* § 227(b)(3) (authorizing "*[a]* person or entity" to commence "an action *based* on a violation of this subsection") (emphasis added); *see also Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 323 (3d Cir. 2015) ("only certain plaintiffs will have suffered the particularized injury required to maintain an action in federal court for a [TCPA] violation . . . Someone with a generalized interest in punishing telemarketers, for example, would not qualify on that basis alone").

As *Lexmark* instructs, the "breadth of the zone of interests varies according to the provisions of law at issue[.]" *Lexmark*, 134 S. Ct. at 1389 (citing *Bennett*, 520 U.S. at 163). With respect to the TCPA, the Seventh Circuit has not yet addressed whether statutory standing is commensurate with Article III standing.[8] It has, however, equated the two in the context of Title VIII, the Fair Housing Act ("FHA"), specifically noting that "the *only* requirement for standing to sue . . . is the Art. III minima of injury in fact[.]" *Gorski v. Troy*, 929 F.2d 1183,

---

[8] The Third Circuit has held that it is not. *See Leyse*, 804 F.3d at 322-23.

1188 (7th Cir. 1991) (emphasis in original) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) and *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979)).  The Supreme Court has held otherwise, though, in the context of Title VII, observing, "If any person injured in the Article III sense by a Title VII violation could sue, absurd consequences would follow."  *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176-77 (2011).  *Thompson* thus construed Title VII's enforcement provision as "enabling suit by any plaintiff with an interest arguably sought to be protected by the statute" while "excluding plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions in Title VII."  *Id.* at 178 (citation and quotation omitted).[9]  The *Thompson* Court further noted that, although decisions such as *Bennett* and *Gladstone* "reiterate[d] that the term 'aggrieved' in Title VIII reaches as far as Article III permits . . . the holdings of those cases are compatible with the 'zone of interests' limitation[.]"  *Id.* at 176.[10]

Here, TSC has failed to identify any "indications from [the] statutory text" suggesting that Congress intended to equate Article III standing with statutory standing under the TCPA. *See Todd*, 731 F.3d at 736.  To the contrary, Section 227(b)(3) speaks of *a* private right of action on the basis of *individualized* violations.  The Court declines, therefore, to equate the citizen-suit provision at issue in *Bennett* with Section 227(b)(3).  *See Bennett*, 520 U.S. at 164-65 (observing that 16 U.S.C. § 1540(g) is "an authorization of remarkable breadth when compared with the language Congress ordinarily uses").

---

[9]  The *Thompson* Court ultimately deemed the retaliatory discharge claim at issue to fall "within the zone of interests protected by Title VII.  Thompson was an employee of NAS, and the purpose of Title VII is to protect employees from their employers' unlawful actions."  *See* 562 U.S. at 178.

[10]  Post-*Thompson* courts in this District continue to equate Article III standing with statutory standing under the FHA.  *See Cty. of Cook v. HSBC N. Am. Holdings Inc.*, 136 F. Supp. 3d 952, 964 (N.D. Ill. 2015) ("But *Thompson* was a case decided under Title VII, not Title VIII; and this Court is obliged to follow the Seventh Circuit's adoption of *Gladstone*").

### 2.       Identifying the Interests Protected

The Court's task, then, is (i) to discern the interests sought to be protected by the statute at issue, and (ii) to inquire whether TSC's interests are among them.  *See Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998); *Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 524 (1991) ("We must inquire then, as to Congress' intent in enacting the [Private Express Statutes] in order to determine whether postal workers were meant to be within the zone of interests protected by those statutes"); *Lexmark*, 134 S.Ct. at 1387 ("Whether a plaintiff comes within the zone of interests is an issue that requires [the court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim").

In conducting this evaluation, courts look to the substantive provision under which the violation is alleged.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1992); *see also Todd*, 731 F.3d at 738 (analyzing the Fair Debt Collection Practices Act ("FDCPA")).  Courts may also "consider any provision which helps [them] to understand Congress's overall purposes" in enacting a given statute.  *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 401 (1987).  Courts may not look beyond the "relevant statute," however, lest the court "deprive the zone-of-interests test of virtually all meaning."  *Postal Workers*, 498 U.S. at 530.

### a.       The Provision at Issue – 47 U.S.C. § 227(b)(1)(A)(iii)

The inquiry thus begins with 47 U.S.C. § 227(b)(1)(A)(iii) – the substantive provision under which TSC has sued ARS.  *See Postal Workers*, 498 U.S. at 523-24.  Applying "traditional principles of statutory interpretation," the Court looks first to the statutory language in order to discern its meaning.  *See Lexmark*, 134 S. Ct. at 1388 ("That question requires us to determine the meaning of the congressionally enacted provision creating a cause of action"); *cf. Patriotic*

*Veterans Inc. v. Indiana*, 736 F.3d 1041, 1047 (7th Cir. 2013) (discussing statutory construction of the TCPA outside the "zone-of-interests" context).

The "call-charged" provision, in particular, prohibits "any person" from using "any automatic telephone dialing system or an artificial or prerecorded voice" to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party)" to "any telephone number assigned to . . . any service for which the called party is charged for the call." *See* 47 U.S.C. § 227(b)(1)(A)(iii). The text of this provision, thus, appears to protect a "called party" from receiving non-emergency, unconsented, automated calls for which the "called party," as opposed to the initiating party, has to incur a charge. The statute does not define "called party," *contra Penn. Chiropractic*, 802 F.3d at 928, although the Seventh Circuit has interpreted such term as "the person subscribing to the called number at the time the call is made." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 639, 643 (7th Cir. 2012) (noting that "only the current subscriber pays" and that "consent must come from the current subscriber").[11] The Court thus reads this "call-charged" provision as guarding against the receipt of, and payment for, unwelcome robocalls.[12]

---

[11] Indeed, the term "called party" has generated extensive litigation, as recited by the Third Circuit in *Leyse*. *See* 804 F.3d at 322-23 (collecting cases and noting, "District courts throughout the country have split over the question of who is entitled to sue under the statute, and they fall into various camps").

[12] Although "[i]t is unnecessary to go beyond the words of the statute . . . the legislative history reinforces [this] observation[.]" *See Marshall & Ilsley Corp. v. Heimann*, 652 F.2d 685, 694 n.15 (7th Cir. 1981). In particular, one Senate Report recited: "The Committee believes that Federal legislation is necessary to protect the public from automated telephone calls. These calls can be an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services." S. REP. NO. 102-178 at 5, *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972-73 (1991)). The FCC—in a 2003 Order—looked to this Senate Report and interpreted the purpose of 47 U.S.C. § 227(b)(1)(A)(iii) as follows:

> The legislative history also suggests that through the TCPA, Congress was attempting to alleviate a particular problem–an increasing number of automated and prerecorded calls to certain categories of numbers. The TCPA does not ban the use of technologies to dial telephone numbers. It merely prohibits such technologies from dialing emergency numbers, health care facilities, telephone numbers assigned to wireless services, and any other numbers for which the consumer is charged for the call. Such practices were determined to threaten public safety and inappropriately shift marketing costs from sellers to consumers. Coupled with the fact that autodialers can dial thousands of numbers in a short period of time, calls to these specified categories of numbers are particularly troublesome.

### b.       Related Robocall Provisions

Related TCPA provisions confirm this understanding of the interests protected by Section 227(b)(1)(A)(iii).  The Court properly looks to—and confines its analysis to—such provisions of the TCPA.  *See All Funds on Deposit*, 783 F.3d at 618 ("Our zone-of-interests inquiry ordinarily would be confined to one statute") (citing *Postal Workers*, 498, U.S. at 523-24, 529-30); *see also Clarke*, 479 U.S. at 401 (courts may "consider any provision [within the same statute] which helps [them] to understand Congress's overall purposes").[13]

The preamble of the TCPA, for example, clarifies that Congress passed the TCPA to "prohibit certain practices involving the use of telephone equipment."  TELEPHONE CONSUMER PROTECTION ACT OF 1991, Pub. L. No. 102–243, 105 Stat 2394 (December 20, 1991).  Under Seventh Circuit precedent, the Court properly considers this statutory preamble in its "zone-of-interests" analysis.  *See All Funds on Deposit*, 783 F.3d at 617 ("We need not resort to legislative history to deduce this conclusion; TRIA's preamble states it is designed '[t]o ensure the continued financial capacity of insurers to provide coverage for risks from terrorism.' Pub.L. No. 107–297").  Indeed, "the TCPA principally outlaws four practices."  *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745, 181 L. Ed. 2d 881 (2012) (interpreting statutory text).

*See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14092 (2003); *see also Lynn v. Monarch Recovery Mgmt., Inc.*, 586 F. App'x 103, 103 (4th Cir. 2014), *as amended* (Oct. 17, 2014) (examining the same).  The Supreme Court has examined legislative history in conducting "zone-of-interests" analyses.  *See, e.g.*, *Postal Workers*, 498 U.S. at 526–27 (1991) (examining a variety of sources in its inquiry "as to Congress' intent in enacting" the statute at issue).

[13]  While examining standing under the Administrative Procedures Act ("APA"), the *Bennett* Court noted that statutory protection "is to be determined not by reference to the overall purpose of the Act in question (here, species preservation), but by reference to the particular provision of law upon which the plaintiff relies."  *Bennett*, 520 U.S. at 175-76.  The underlying Ninth Circuit opinion, however, prompted this language.  *See id.* at 175 ("The Court of Appeals concluded that this test was not met here, since petitioners are neither directly regulated by the ESA nor seek to vindicate its overarching purpose of species preservation.  That conclusion was error").  Given this posture, the Court does not read this language as precluding all consideration of statutory purpose in its "zone-of-interests" analysis.  *See White Oak Realty, LLC v. U.S. Army Corp of Engineers*, No. CIV.A. 13-4761, 2014 WL 4387317, at *7 (E.D. La. Sept. 4, 2014) ("*Lexmark* makes clear that—whatever the previous import of *Bennett*—a court may properly consider the overall purpose of a Congressional act when applying the zone of interests test, especially if that purpose is expressly articulated in a separate provision of the act").

22

In particular, Subsection 227(b) (entitled "Restrictions on use of automated telephone equipment") contains three paragraphs. The first sets forth "[p]rohibitions." *Id.* § 227(b)(1). The second discusses the FCC's authority to promulgate "[r]egulations." *Id.* § 227(b)(2). The third creates a "[p]rivate right of action" for "a violation of this subsection." *Id.* § 227(b)(3). The paragraph entitled "Prohibitions" contains four subparagraphs. As the Third Circuit in *Leyse* recited:

> The first subparagraph forbids using an "automated telephone dialing system or an artificial or prerecorded voice" without the consent of the "called party" [unless for emergency purposes] when calling emergency telephone lines, hospital patient rooms, pagers, cell phones, or any service for which the "called party" would be charged. *Id.* § 227(b)(1)(A). The second subparagraph . . . proscribes "using an artificial or recorded voice" when calling "any residential telephone line" without the consent of the "called party." *Id.* § 227(b)(1)(B). The third prohibits sending "unsolicited advertisement[s]" by facsimile to a "recipient." *Id.* § 227(b)(1)(C). And the fourth prohibits using "an automatic telephone dialing system" to tie up two or more telephone lines of a "multi-line business" simultaneously. *Id.* § 227(b)(1)(D).

804 F.3d at 324-25. Based on the plain text, these prohibitions protect against unwanted and/or otherwise inconvenient robocall practices, particularly those that implicate privacy and/or public safety concerns. Indeed, the paragraph entitled "Regulations" further clarifies that the FCC may "exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the [FCC] may prescribe as necessary in the *interest of the privacy rights this section is intended to protect*." *See* 47 U.S.C. § 227(b)(2)(C) (emphasis added); *see also* § 227(b)(2)(B)(ii) (same). The paragraph entitled "Private right of action," meanwhile, authorizes "[a] person or entity" to bring an action "based on a violation of this" Subsection 227(b) or the regulations prescribed thereunder. *See id.* § 227(b)(3).

Congressional findings accompany the statutory text and further confirm this understanding. As the Third Circuit noted in *Leyse*, "Congress made several findings in the

Telephone Consumer Protection Act that allow us to trace the contours of the protected zone of interests[.]" *Leyse*, 804 F.3d at 325.  The Court may consider this text, as well.  *See Lexmark*, 134 S. Ct. at 1389 ("Identifying the interests protected by the Lanham Act . . . requires no guesswork, since the Act includes an 'unusual, and extraordinarily helpful,' detailed statement of the statute's purposes") (citing 15 U.S.C. § 1127);[14] *Leyse*, 804 F.3d at 325 (equating the TCPA's statement of congressional findings with the "detailed statement" present in *Lexmark*); *cf. Mims*, 132 S. Ct. at 745 (considering TCPA congressional findings); *Gonzales v. Raich*, 545 U.S. 1, 21 (2005) ("congressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme").

In particular, Congress highlighted consumer "outrage" over "automated or prerecorded telephone calls, regardless of the content or the initiator of the message" as being "a nuisance and an invasion of privacy."  *See* Pub. L. No. 102-243, § 2, ¶¶ 10, 6.  Specifically, Congress found that "unrestricted telemarketing . . . can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety."  *Id.* ¶ 5. Congress further noted that "[b]usinesses also have complained . . . that automated or prerecorded telephone calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce."  *Id.* ¶ 14.  Accordingly, in enacting the TCPA, Congress sought to balance "individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade . . . in a way that protects the privacy of individuals and permits legitimate telemarketing practices."  *Id.* ¶ 9.  Courts, too, highlight these "privacy" and "nuisance" interests, as derived from the statutory text.  *See Mims*, 132 S. Ct. at 745 (interpreting Pub. L. No. 102-243, § 2);

---

[14]  The *Lexmark* Court ultimately looked to this stated purpose to hold that "to come within the zone of interests in a suit for false advertising[,] a plaintiff must allege an injury to a commercial interest in reputation or sales."  *Id.* at 1389-90.  Because the *Lexmark* plaintiff had alleged lost sales and damage to its business reputation, it fell within the Lanham Act's zone of interests.  *Id.* at 1393.

*Leyse*, 804 F.3d at 325-26 (same); *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d

999, 1008-09 (N.D. Ill. 2010) (same); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1258

(11th Cir. 2014) (interpreting 47 U.S.C. § 227(b)(2)(C)); *Patriotic Veterans*, 736 F.3d at 1050

(interpreting 47 U.S.C. §§ 227(b)(2)(B), (C)).

       In view of the statutory text, the Court discerns several interests protected under 47

U.S.C. § 227(b)(1)(A)(iii), including individual privacy rights, public safety interests, and

interstate commerce.  *See Nat'l Credit Union*, 522 U.S. at 492.  Underlying each is the principle

that a person or business[15] should be free from nuisance robocalls and their associated costs.

### 3.      TSC's Interests

       The Court next inquires whether TSC's interests are among those protected by the statute.

*See Nat'l Credit Union*, 522 U.S. at 492.  According to the Second Amended Complaint, the

"TSC 'honeypot' is comprised of thousands of telephone numbers to which TSC subscribes."

(R.77 at ¶ 11).  The purpose of the "honeypot" is to gather, *en masse*, "data related to inbound

calls."  (*Id.* ¶¶ 10, 12).  TSC's proprietary algorithm then analyzes this data, enabling it to detect

"high frequency robocalling patterns and [to] distinguish between calls placed by robocallers and

calls placed by non-robocallers."  (*Id.* at ¶ 13).  Although ARS began placing robocalls to TSC

honeypot numbers in March 2014, TSC only began answering such calls—and incurring per-

minute charges for each answered call—in May 2015.  (*Id.* ¶¶ 22, 30, 41-43; R.77-1, Exhibit A).

TSC has never provided "express consent" for these robocalls, and it "does not solicit or

otherwise entice callers to call any TSC Number."  (*Id.* at ¶¶ 26-27, 33-34).  TSC now seeks

---

[15]  Another court in this District has rejected the idea that Section 227(b)(1)(A)(iii) "does not apply to calls made to businesses"—specifically, calls made to TSC—in observing that:  "The plain language of the statute states that it is unlawful to make '*any* call using any automatic telephone dialing system' to '*any* telephone number assigned to . . . *any* service for which the called party is charged for the call.'  47 U.S.C. § 227(b)(1) (emphasis added).  Because the language of the statute is unambiguous, does not expressly exclude calls made to businesses (indeed, it uses the broad and inclusive word "any"), and TSC's allegations fall within the statutory prohibition of § 227(b)(1)(A)(iii), the Court rejects the defendants' position."  *Telephone Sci. Corp. v. Trading Advantage*, 1:14-cv-04369, Dkt. No. 79 (Feb. 17, 2015) (Guzman, J.).

relief based on past ARS robocalls to TSC Numbers, which TSC answered and for which TSC incurred per-minute charges. (*Id.* ¶ 42).

According to ARS, TSC's relevant "interest" is commercial data collection – *not* individual privacy rights, public safety protection, or interstate commerce facilitation. Indeed, some courts have placed similar interests outside Section 227(b)(1)(A)(iii)'s zone of interests.

### a. "Commercial" Cases

In *Cellco Partnership v. Wilcrest Health Care Management*, for example, the district court examined TCPA claims brought by Verizon Wireless (Verizon") and OnStar, LLC ("OnStar"). *See* No. CIV.A. 09-3534 MLC, 2012 WL 1638056 (D.N.J. May 8, 2012). Specifically, Verizon and OnStar alleged that the defendants had placed "literally hundreds of thousands" of automated telemarketing calls "to either (i) Verizon Wireless subscribers on their wireless phones, including calls made to employee concession accounts, or (ii) OnStar cellular equipment embedded in the automobiles of OnStar's subscribers." *Id.* at *2. Verizon sought statutory damages insofar as the "concession accounts" were "cellular service accounts that [were] owned and paid for by Verizon . . . [that it] either use[d] itself or ma[de] available to certain of its employees" for business purposes. *Id.* at *3. OnStar, meanwhile, sought statutory damages insofar as it "had to pay for calls that it [was] required to answer because of its unique operating system." *Id.*[16] In relevant part, the *Cellco* court dismissed these TCPA claims on "prudential grounds." *Id.* at *7. The court noted, in particular:

> Plaintiffs do not fall into the zone of interests protected by the TCPA. Their damages are not of the vexatious and intrusive nuisance nature sought to be redressed by Congress in enacting the TCPA, but rather are indirect, economic, and inherent to their business. That the TCPA is intended to be used at the individual level is supported not only by the legislative history to that effect, but also the statutory exemption for otherwise prohibited

---

[16] In particular, OnStar had alleged that its equipment "must accept every call to that vehicle, regardless of whether the vehicle is being operated or is occupied and regardless of whether the subscriber has purchased phone minutes and is able to receive telephone calls using the equipment." *Id.*

calls to which the called party has consented. 47 U.S.C. § 227(b)(1)(A). This exemption requires a per-phone-line inquiry that is at odds with Plaintiffs' allegations of thousands of allegedly illegal calls made to unidentified and unquantified "Verizon Concession Accounts" and, apparently, any and all OnStar equipment . . . [The TCPA] anticipates damages on an individual basis because the contemplated plaintiff is an individual natural person or business with a limited number of phone lines on which it might receive telemarketing calls . . . Plaintiffs, on the other hand, seek enormous damages based on allegations of 'hundreds of thousands' or even millions of calls, without acknowledging that the only reason for this volume of calls is due to the nature of their business, which is providing telecommunications services rather than consuming them.

*Id.* at *8-9 (analyzing § 227(b)(1)(A)(iii)).

More recently, a district court within the Western District of Pennsylvania examined the "unique" case of an individual plaintiff who had "admitted that she files TCPA actions as a business." *See Stoops v. Wells Fargo Bank, N.A.*, No. 3:15-83, 2016 WL 3566266, at *5, 9 (W.D. Pa. June 24, 2016). In view of this admission, the *Stoops* court held that the calls "did not constitute the nuisance, invasion of privacy, cost, and inconvenience from which Congress intended to protect consumers[.]" *Id.* at *11. Furthermore, the plaintiff had not "suffered an economic injury" insofar as she admitted "that her only purpose in purchasing her cell phones and minutes is to receive more calls, thus enabling her to file TCPA lawsuits[.]" *Id.* at *12.[17] With respect to statutory standing, the *Stoops* court held:

Plaintiff's interests are not within the zone of interests intended to be protected by the TCPA. Plaintiff's interests, which include purchasing cell phones with the hope of receiving calls from creditors for the sole purpose of collecting statutory damages, are not among the sorts of interests [the TCPA was] specifically designed to protect. Given her admissions, which are described above, the Court finds that Plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the [TCPA] that it cannot reasonably be assumed that Congress intended to permit the suit . . . Indeed, it is unfathomable that Congress considered a consumer who files TCPA actions as a business when it enacted the TCPA as a result of its "outrage over the proliferation of prerecorded

---

[17] With respect to constitutional standing, the *Stoops* court also rejected the plaintiff's argument that "Article III standing can exist even where the plaintiff purposefully chose to interact with a defendant engaged in illegal misconduct," noting that, "unlike Plaintiff, the tester in [*Havens Realty v. Coleman*, 455 U.S. 363] suffered the very harm that the Fair Housing Act was designed to prevent." *Id.* at *13.

telemarketing calls to private residences, which consumers regarded as an intrusive invasion of privacy and a nuisance."

*Id.* at *15 (citations and quotations omitted).

Conversely, other courts have held that a "professional plaintiff" is *not* "outside of the TCPA's statutory zone of interest." *See Fitzhenry v. ADT Corp.*, No. 14-80180, 2014 WL 6663379, at *5 (S.D. Fla. Nov. 3, 2014). In *Fitzhenry*, an individual plaintiff had "created a home environment that allows him to document telemarketing calls better than most consumers" – specifically, he had "several different phone numbers at his home to get '[a] higher volume of [telemarketing] calls.'" *Id.* at *4-5 (citing the deposition testimony of the plaintiff's daughter). The *Fitzhenry* court nonetheless upheld "zone-of-interest" protection because "Plaintiff allege[d] in his Complaint that he received an 'unwanted' telemarketing call, and Defendants have not cited any contradictory statements by Plaintiff." *Id.* at *5. Other courts have recognized that a litigant's status as a "professional plaintiff" does not necessarily vitiate a TCPA claim. *See, e.g.*, *Martin v. Bureau of Collection Recovery*, No. 10 C 7725, 2011 WL 2311869, at *4 (N.D. Ill. June 13, 2011) ("Characterizing Plaintiff as a 'professional plaintiff' does not boost [Defendant's] argument in this discovery motion or any arguments in response to Plaintiff's motion for class certification"); *Martin v. Comcast Corp.*, No. 12 C 6421, 2013 WL 6229934, at *2 (N.D. Ill. Nov. 26, 2013) ("nor can we dismiss [plaintiff's] claims merely because he files lots of these cases"); *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 461 (6th Cir. 2010) ("[Plaintiff] has not been shy in taking on the role of a private attorney general under the [TCPA]. Since 1998, he has filed claims against at least twelve defendants in at least thirteen lawsuits under the Act"); *Charvat v. Travel Servs.*, 110 F. Supp. 3d 894, 898 (N.D. Ill. 2015) (same). None of these other decisions, however, deal with statutory standing – in particular, whether a "professional plaintiff" falls within Section 227(b)(1)(A)(iii)'s zone of interests.

28

### b.    TSC's Statutory Standing

Ultimately, even accepting all factual allegations as true, and drawing all reasonable inferences in TSC's favor, TSC's asserted interests do not fall within Section 227(b)'s protected zone of interests.

As TSC acknowledges, the focus of the TCPA—and related efforts—is to provide "consumer protection for millions of Americans harassed by unwanted and unwelcome robocalls." (R.77, Second Am. Compl. ¶¶ 44-45). Indeed, TSC's Nomorobo service *represents* one such effort in the battle against robocalls. (*Id.* at ¶ 9 ("As of the date on which this second amended complaint is being filed, the Nomorobo service has helped consumers to avoid over 64 million unwanted robocalls")). TSC's "good guy" status, however, does not automatically entitle *it* to claim protection under the TCPA. (R.95, Rule 12(b)(6) Response Br. at 1-2). Like the plaintiffs in *Cellco* and *Stoops*—and unlike the plaintiff in *Fitzhenry*—TSC does not allege any injuries in the form of privacy invasion, nuisance, and/or inconvenience. To the contrary, the sole reason TSC subscribes to "thousands" of honeypot numbers is to gather a "large quantity" of data in order to "detect high frequency robocalling patterns" and to "distinguish" between callers for its Nomorobo customer-service offerings. (R.77, Second Am. Compl. at ¶ 10 ("In order to provide the Nomorobo service to consumers . . .")). Thus, instead of being "unwanted and unwelcome," robocalls to TSC Numbers provide the analytical basis on which the Nomorobo service operates. "[T]he only reason for this volume of calls," thus, 'is due to the nature of [TSC's] business, which is providing telecommunications services rather than consuming them." *Cellco*, 2012 WL 1638056 at *9. Furthermore, TSC suffered alleged monetary damages because it began to answer—and incur charges for—known robocalls in May 2015. Even construed in the light most favorable to TSC, these damages "are not of the

vexatious and intrusive nuisance nature sought to be redressed by Congress in enacting the TCPA, but rather are indirect, economic, and inherent to [its] business." *Id.* at *8.

TSC argues that it "has simply embraced its role of 'private attorney general,' which Congress specifically authorized entities like [itself] to undertake when Congress enacted the TCPA." (R.95, Rule 12(b)(6) Response Br. at 2). TSC's authorities make clear, however, that the TCPA enables individual relief stemming from individual violations; it does not contemplate generalized "citizen-suit" protection. *See Bais Yaakov of Spring Valley v. ACT, Inc.,* 798 F.3d 46, 49 (1st Cir. 2015), *cert. denied*, 136 S. Ct. 982, 194 L. Ed. 2d 13 (2016) (recognizing that where "Congress has chosen to empower citizens as private attorneys general to pursue claims for well-defined statutory damages," defendants "can most easily offer an individual plaintiff relief on her personal claim in an amount that indisputably equals the highest amount that the individual plaintiff could recover on her own claim"); *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1105 (11th Cir. 2015) (discussing individual TCPA violations).[18] The fact that Congress incentivized individual litigants—whether a person or an entity—to bring individual TCPA claims does not abrogate the requirement that the claimant must, as a threshold matter, fall within the statute's "zone of interests." *See Leyse*, 804 F.3d at 324 ("Article III is not the only barrier faced by potential plaintiffs. Congress surely did not intend, for example, to enable a plaintiff to sue merely because she learned that a friend or neighbor had received a robocall").

Here, TSC did not suffer the injury contemplated by the TCPA— that is, invasion of privacy and/or general nuisance. *See generally* Pub. L. No. 102-243, § 2; *see also Mims*, 132 S.

---

[18] Indeed, other courts—examining legislative history—have characterized Section 227(b)(3) as "allowing consumers to bring an action . . . against any entity that violates the bill," "preferably in small claims court . . . or a similar court" in order to "allow the consumer to appear before the court without an attorney." *Cellco*, 2012 WL 1638056 at *8 (citing 137 Cong. Rec. S16205 (daily ed. Nov. 7, 1991)).

Ct. at 745; *Lozano*, 702 F. Supp. 2d at 1008-09.  Moreover, even after amending its complaint

twice, TSC does not explain how ARS robocalls to *its* honeypot numbers—as opposed to its

customers' numbers—threaten public safety or impede interstate commerce.  *See id.*  Even

drawing all reasonable inferences in TSC's favor, the Court does not see how TSC suffered any

injury within Section 227(b)(1)(A)(iii)'s "zone of interests" that would allow it to act as a

"private attorney general" under Section 227(b)(3).[19]  *See Leyse*, 804 F.3d at 326 ("Congress's

repeated references to privacy convince us that a mere houseguest or visitor who picks up the

phone would likely fall outside the protected zone of interests").

TSC's reliance on *Havens Realty*, therefore, is misplaced.  In *Havens Realty*, the

Supreme Court determined that a "black tester" had standing under the FHA given her "alleged

injury to her statutorily created right to truthful housing information."  *Havens Realty*, 455 U.S.

at 374.  The absence of any true intent to rent did not negate the fact that the tester had suffered

*precisely the type of injury* envisioned by the FHA.  *See id.*; *see also Church v. Accretive Health,

Inc.*, No. 15-15708, 2016 WL 3611543, at *3 (11th Cir. July 6, 2016) ("Just as the tester-plaintiff

[in *Havens Realty*] had alleged injury to her statutorily-created right to truthful housing

information, so too has Church alleged injury to her statutorily-created right to information

pursuant to the FDCPA").  Here, by contrast, TSC's alleged injury is not the type of injury with

which the TCPA is concerned.  *See Stoops*, 2016 WL 3566266 at *13, 15 (rejecting a similar

argument by a plaintiff who lacked the "sorts of interests [the TCPA was] specifically designed

to protect").  In this case, TSC's purposeful interaction with ARS does not place it outside the

realm of statutory protection.  The absence of a statutorily-protected interest, however, does.

---

[19]  The Court has already distinguished *Bennett*, 520 U.S. at 163-66, on these grounds.  *See* discussion, *supra*.

As *Lexmark* makes clear, the "lenient approach" to zone-of-interests analysis in APA cases does not apply to all other cases.  *See* 134 S. Ct. at 1389 (recognizing that, in the context of the APA's "generous review provisions," a plaintiff falls outside the statutory "zone of interests" only when his "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed" that Congress intended to permit the suit).[20]  In *Lexmark*, for example, the Supreme Court looked to statutory purpose and declined to give the Lanham Act's enforcement provision an "expansive reading."  *See* 15 U.S.C. § 1125(a)(1) (authorizing suit by "any person who believes that he or she is likely to be damaged" by a defendant's false advertising under the Lanham Act); *Lexmark*, 134 S. Ct. 1388-90 (cautioning against a literal reading of "any person" and noting the "unlikelihood that Congress meant to allow all factually injured plaintiffs to recover").  Here, too, the presence of explicit congressional findings and the statutory emphasis on "privacy rights" constrains the Court in reading Section 227(b)(3)'s "person or entity" language too broadly.  *See* 47 U.S.C. §§ 227(b)(2)(C), 227(b)(2)(B)(ii); *Patriotic Veterans*, 736 F.3d at 1050 (citing the same as "noting the privacy interests behind the statute and requiring the [FCC] to consider privacy interests in using its rulemaking authority"); *see generally* Pub. L. No. 102-243, § 2.  Indeed, according to its findings, Congress passed the TCPA, in part, because "technologies that might allow consumers to avoid receiving such [nuisance] calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer."  *See* Pub. L. No. 102-243, § 2, ¶ 11.  Today, Nomorobo stands as one such technology, available to protect consumers from unwanted robocalls.  The TCPA, meanwhile, stands as a *separate* protection mechanism.  TSC's attempt to conflate the two, however, must fail.  Because TSC has failed to allege an interest

---

[20]  The judicial review provision of the APA "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review."  *Lexmark*, 134 S. Ct. at 1389.

with which the TCPA is concerned—privacy invasion, nuisance, public safety threat, and/or the shifting of costs based on unwelcome robocalls—the Court finds that TSC lacks statutory standing under 47 U.S.C. § 227(b)(1)(A)(iii).[21]

### B. Alternative Bases for Rule 12(b)(6) Dismissal

Based on the foregoing analysis, the Court dismisses the Second Amended Complaint with prejudice. *See Friends of Trumbull v. Chicago Bd. of Educ.*, 123 F. Supp. 3d 990, 999 (N.D. Ill. 2015) (dismissing with prejudice claims that failed to satisfy the "zone-of-interests" test and collecting cases). Given this disposition, the Court need not reach ARS' other arguments in favor of Rule 12(b)(6) dismissal. The Court further denies as moot ARS' motion to strike 297 claims added without leave of the Court. (R.87).

### CONCLUSION

For the foregoing reasons, the Court denies ARS' Rule 12(b)(1) motion (R.81) and denies as moot ARS' motion to strike. (R.87). The Court grants ARS' Rule 12(b)(6) motion and dismisses this case with prejudice. (R.84).

**Dated:** August 8, 2016

_____
AMY J. ST. EVE
United States District Court Judge

---

[21] Given TSC's allegation that its technology enables it to pick out "'whitelist' numbers associated with acceptable incoming calls," (R.77, ¶ 8), the Court does not consider ARS' related argument that the "threat of massive liability will inevitably reduce calls that consumers actually want and consent to." (R.85, Rule 12(b)(6) Br. at 9-10).